J-S17004-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.A.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.C.-L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 51 EDA 2022 |

Appeal from the Order Entered December 13, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002226-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.E.C.-A.., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.C.-L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 52 EDA 2022 |

Appeal from the Decree Entered December 7, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000474-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: I.C.-A.., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.C.-L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 53 EDA 2022 |

Appeal from the Order Entered December 13, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001157-2018

| IN THE INTEREST OF: I.E.C.A., A MINOR | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: M.C.-L., MOTHER | : : : : : : : : | |
| | : | No. 54 EDA 2022 |

Appeal from the Decree Entered December 7, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000475-2020

BEFORE: BOWES, J., LAZARUS, J., and STABILE, J.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 9, 2022**

M.C.-L. ("Mother") appeals the December 13, 2021 orders changing the permanency goals to adoption with respect to her two sons, Y.A.-C., a/k/a Y.E.C.-A., born in September of 2018, and I.C.-A., a/k/a I.E.C.A., born in April of 2014. In addition, Mother appeals from the December 7, 2021 decrees involuntarily terminating her parental rights to both children.[1] We affirm the goal change orders and the termination of parental rights.[2]

The relevant facts and procedural history are as follows. The Philadelphia Department of Human Services ("DHS") first became aware of this family in February of 2018, prior to Y.E.C.-A.'s birth, upon receiving a

---

[1] This Court consolidated Mother's appeals *sua sponte*.

[2] By separate decrees, the trial court terminated the parental rights of E.A. ("Father") to Y.E.C.-A., I.C.-A., and O.C.-A., an older sibling. We dispose of Father's appeal in a separate memorandum.

- 2 -

report alleging medical neglect of his older siblings, O.C.-A. and I.C.-A. N.T., 5/11/18, at 15.[3] In its investigation, DHS learned that I.C.-A. suffers from a heart condition, and that his cardiology appointments had been neglected. *Id*. at 9; N.T., 8/23/18, at 9. In addition, I.C.-A.'s primary care appointments were neglected, and, for reasons unspecified in the record, I.C.-A. needed orthopedic and ophthalmology appointments. N.T., 5/11/18, at 9.

DHS also learned that Mother and Father were married and living with O.C.-A. and I.C.-A. in the home of Father's parents, along with them and Father's two adult siblings. N.T., 12/7/21, at 23. Shortly after DHS received the report, Mother left Philadelphia County with O.C.-A. and I.C.-A. N.T., 5/11/18, at 15. She returned with both children in April of 2018, at which time DHS received a second report alleging medical neglect, domestic violence, and inappropriate discipline of the children by the paternal grandparents. *Id*. at 6, 8, 15; N.T., 12/7/21, at 9.

On May 3, 2018, DHS assisted Mother, O.C.-A. and I.C.-A. in leaving the home and moving to a domestic violence shelter. N.T., 8/23/18, at 15. The record reveals that, at the time of their removal from the home, O.C.-A. had dried blood on his shirt, which he stated to the DHS caseworker was the result of Father punching him in the face. *Id*. at 13.

---

[3] Although Mother did not appeal the goal change or involuntary termination of parental rights with respect to O.C.-A., we discuss that child's involvement in this matter because it impacts his younger siblings, particularly I.C.-A., with whom O.C.-A. currently resides.

On May 9, 2018, the trial court placed O.C.-A., then nearly six years old, and I.C.-A., then four years old, in the protective custody of DHS, due to Mother notifying DHS that she planned to return to Father's home, and that she was able to protect the children from him. *Id*. at 7, 10. At the time of their placement, O.C.-A. and I.C.-A. were still wearing diapers and drinking from bottles. *Id*. at 9. In addition, they were minimally verbal. *Id*.

The trial court placed O.C.-A. and I.C.-A. in shelter care on May 11, 2018. The court held a dependency hearing on August 23, 2018, during which counsel for Mother and Father stipulated to the adjudication of dependency based on "present inability" to provide proper parental care. N.T., 8/23/18, at 4-5. By order dated August 23, 2018, the court adjudicated O.C.-A. and I.C.-A. dependent and established their permanency goal as reunification. They have resided in the same pre-adoptive foster home since October 2019.

Mother gave birth to Y.E.C.-A. in September of 2018. Upon discharge from the hospital, the court placed Y.E.C.-A. in the protective custody of DHS. Following additional hearings, the court adjudicated him dependent on October 11, 2018. Y.E.C.-A.'s permanency goal was also reunification.

The trial court directed Mother to participate in a psychological evaluation. Mother complied in September of 2018, prior to Y.E.C.-A.'s birth, with Dana P. Reinhold, Ph.D., who was assisted by a Spanish language interpreter. It is undisputed that English is Mother's second language. Mother self-reported that she is illiterate in both Spanish and English. In addition,

she has received some form of mental health treatment since she was four years old, including unspecified psychotropic medication and counseling.

As part of the psychological evaluation, Mother participated in an intellectual screening, which resulted in an index score of 83. Dr. Reinhold described this score as the "Below Average range of intellectual functioning." Psychological Evaluation, 9/25/18, at 14. Dr. Reinhold stated that Mother will be "able to function adequately in many situations but [will] be challenged by more complicated problems in life." **Id**. With respect to O.C.-A.'s and I.C.-A.'s dependencies, Dr. Reinhold stated that Mother "appears to lack insight into what will be necessary for her to ensure her children's safety and be reunited with them." **Id**.

Dr. Reinhold diagnosed Mother, in part, with major depressive disorder, an adult and childhood history of physical abuse, and a history of sexual abuse. Dr. Reinhold recommended that Mother participate in, *inter alia*, domestic violence counseling, a parenting program, and long-term individual trauma-informed psychotherapy "to help her integrate what she learns from the domestic violence and parenting programs." **Id**.

Following Y.E.C.-A.'s birth and dependency adjudication, Mother participated in a court-ordered parenting capacity evaluation with Sheetal A. Duggal, Psy.D., which was also assisted by a Spanish language interpreter. Mother self-reported that she was in weekly therapy and prescribed unspecified psychotropic medication for sleep. She confirmed that she was

not compliant with her regimen of prescription medication. Parenting Capacity Evaluation, 10/11/19, at 10, 15. In fact, Mother denied needing mental health treatment and denied any problems "with her mood or behavior. . . ." *Id*. at 10. Dr. Duggal found Mother's mental health history significant for "Major Depressive Disorder, recurrent, severe with psychotic features" and Acute Schizophrenic Episode[s.]" *Id*. at 16. In addition, Dr. Duggal found that Mother may suffer from a "thought disorder" evidenced by her "belief that other people can read her mind." *Id*. at 12. Dr. Duggal also found that she "struggled with abstract reasoning skills." *Id*.

During the parenting capacity evaluation, Mother denied that O.C.-A.'s and I.C.-A.'s medical needs had been neglected at the time of their placement. *Id*. at 15. She conceded other validated allegations regarding this family, *i.e.*, domestic violence and inappropriate physical discipline of O.C.-A. and I.C.-A., but she "projected responsibility" onto Father and his immediate family members. *Id*. at 13, 15. Dr. Duggal stated that Mother "presented with limited insight" and rationalized why she remained in Father's home with O.C.-A. and I.C.-A. despite the apparent danger. *Id*. at 13. Based on the foregoing, Dr. Duggal opined that Mother "does not present with the capacity to provide safety, permanency, and well-being" to O.C.-A., I.C.-A., and Y.E.C.-A. *Id*. at 16. Dr. Duggal recommended, in part, that Mother participate in mental health therapy, supervised visitation with the children, and a parenting program "for children with complex medical/mental health needs." *Id*.

Permanency review hearings were held at regular intervals. By the end of 2019, Mother had completed her initial permanency plan objectives, *i.e.*, attended programs for parenting, domestic violence, and anger management. N.T., 12/7/21, at 13-14. However, according to Britney Hall, the caseworker assigned to the family between June of 2018 and September 30, 2021, Mother was also required to participate in mental health therapy, weekly supervised visitation, parenting classes for children with disabilities, and court hearings. *Id*. at 14-15, 76. Mother did not satisfy these latter objectives. *Id*. at 17-18, 31.

On December 22, 2020, DHS filed petitions to change the children's permanency goals to adoption and to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The combined evidentiary hearing occurred on December 7, 2021, when I.C.-A. was seven years old and Y.E.C.-A. was three years old. Mario D'Adamo, Esquire, represented the legal interests of I.C.-A.[4] The Support

_____

[4] I.C.-A. does not understand the concept of adoption, but he informed counsel that wanted to remain with his older brother, O.C.-A., with whom he resides in a pre-adoptive foster home. N.T., 12/7/21, at 143. Insomuch as Y.E.C.-A's legal interests were incapable of ascertainment due to his young age, the court did not appoint separate legal counsel for Y.E.C.-A. *See In re T.S.*, 192 A.3d 1080, 1092-1093 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied.).

Center for Child Advocates represented the best interests of all of three children.[5]

DHS presented the testimony of the CUA caseworkers, Britney Hall, *via* telephone, and her successor, Khalif Rhodan. It also presented the children's respective foster mothers and Beatrice Coles, the CUA caseworker who supervised Mother's visitations since May 2021. Mother testified on her own behalf.

The testimony of Ms. Hall and the foster mothers revealed that the children have special needs. Specifically, I.C.-A. suffers from a cardiac problem, which is monitored by St. Christopher's Hospital. N.T., 12/7/21, at 26, 109. In addition, I.C.-A. receives trauma-based therapy for behavioral issues. *Id*. at 26.

I.C.-A. and his older sibling, O.C.-A., have remained together since they were five and seven years old, respectively. *Id*. at 105-106. According to their foster mother, I.C.-A. was unable to spell two and three letter words when he began residing with her and is currently "really delayed in" reading, math, and comprehension. *Id.* at 106, 108. I.C.-A. was evaluated by a school psychologist in 2020, and tested for Individualized Education Plans ("IEP") in

_____

[5] The certified record does not identify a specific individual as Child Advocate; however, Frank P. Cercone, Esquire, who is associated with the Support Center for Child Advocates, is listed in our records as the initial guardian *ad litem*. Two additional attorneys subsequently entered their appearances in this Court as guardian *ad litem* and filed a brief in support of the goal change and termination of Mother's parental rights.

October of 2021. *Id*. The IEP had not been finalized at the time of the hearing. *Id*.

With respect to the youngest child, Y.E.C.-A., he receives speech therapy for delayed speech. N.T., 12/7/21, at 26-27, 137, 139. In addition, Y.E.C.-A. has an IEP. *Id.* at 137. Since he was three days old, Y.E.C.-A. has resided in his current pre-adoptive foster home, separate from his brothers. *Id.* at 137, 140.

On December 7, 2021, the trial court changed the children's permanency goals to adoption and involuntarily terminated Mother's parental rights pursuant to the grounds asserted in the termination petitions.[6] On December 24, 2021, Mother timely filed notices of appeal from the goal change orders and the involuntary termination decrees with respect to the younger children, I.C.-A. and Y.E.C.-A.[7] She simultaneously filed concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court issued its Rule 1925(a) opinion on February 16, 2022.

Mother presents the following issues for review:

A. Whether [DHS] failed to prove by clear and convincing evidence that [M]other's parental rights should have been terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8)

---

[6] The trial court entered amended goal change orders with respect to I.C.-A. and Y.E.C.-A. on December 13, 2021, that corrected a clerical mistake that omitted the goal change to adoption.

[7] Mother amended her notices of appeal from the goal change orders to reflect those orders re-entered on the trial court docket on December 13, 2021.

since she had substantially completed her single case plan objectives as required to have [I.C.-A. and Y.E.C.-A.] returned to her?

B.     Whether there was a strong emotional and parental bond between [Mother] and [I.C.-A. and Y.E.C.-A.] which would have had a negative effect on the children if the parental bond was permanently severed?

C.     Whether [DHS] failed to prove by clear and convincing evidence that the permanency goal should be change to adoption where she had substantially completed her single case plan objectives as required to have [I.C.-A. and Y.E.C.-A.] returned to her?

Mother's brief at 5.   We note with disapproval that Attorney D'Adamo neglected to file a brief advocating the children's legal interests in this appeal.

In reviewing Mother's two issues regarding the involuntary termination decrees, we must determine whether the decrees are supported by competent evidence.  *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021).  When applying this standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record.  *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021).  "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion."  *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

Simply put, "An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result."  *In re Adoption of S.P.*, 47 A.3d 817, 826–827

(Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, *supra* at 1123–1124.

The involuntary termination of parental rights is governed by § 2511 of the Adoption Act, which requires a bifurcated analysis. 23 Pa.C.S. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under § 2511(a). Only if the court determines that the petitioner established grounds for termination under § 2511(a) does it then engage in assessing the petition under § 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must prove grounds under both § 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, *supra* at 359 (*quoting Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

We need only agree with any one subsection of § 2511(a), along with § 2511(b), to affirm the termination of parental rights. *In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa.Super. 2019) (*en banc*) (citation omitted). In

this case, we analyze the decrees pursuant to § 2511(a)(2) and (b), which

provide as follows.

>**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>. . . .
>
>(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>. . . .
>
>**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . . .

23 Pa.C.S. § 2511(a)(2), (b).

The grounds for termination of parental rights under § 2511(a)(2) due

to parental incapacity are not limited to affirmative misconduct and may also

include acts of refusal and incapacity to perform parental duties. *In re S.C.*,

247 A.3d 1097, 1104 (Pa.Super. 2021) (citation omitted). We have long

recognized that a parent is required to make diligent efforts towards the

reasonably prompt assumption of full parental responsibilities. *In re*

*Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (citation omitted).

At a termination hearing, the orphans' court may properly reject as untimely

- 12 -

or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available services during the dependency proceedings. *In re S.C.*, *supra* at 1105 (citation omitted).

With respect to § 2511(b), this Court has stated that the trial court "must . . . discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005) (citation omitted). Further,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010).

In her first issue, Mother argues that DHS did not prove by clear and convincing evidence that her conduct warranted termination of her parental rights. Specifically, Mother asserts that she "completed a substantial amount of her objectives that were available," including programs for parenting, domestic violence, and anger management. Mother's brief at 9. With respect to the objectives subsequently assigned to her, Mother asserts that she did not attend a program for parents of children with disabilities because the CUA could not locate one, which the evidence supports. *See* N.T., 12/7/21, at 75 (Ms. Hall testified, "CUA was not able to locate a parenting class for children that have special needs."). However, Mother does not set forth her remaining permanency objectives or claim that they were unavailable. Mother merely

attempts to support her argument by stating that she "moved in with her sister and started to more regularly attend mental health. She was involuntarily hospitalized for mental health issues in 2021, but completed her stay and then resumed outpatient services when released. She resumed her visits." Mother's brief at 12. Mother's argument is without merit.

It is undisputed that Mother initially completed programs for parenting, domestic violence, and anger management by the end of 2019. N.T., 12/7/21, at 13-14. As explained above, however, along with parenting classes for children with disabilities, the CUA tasked Mother with the additional objectives of attending mental health therapy, weekly supervised visitation, and court hearings. N.T., 12/7/21, at 14-15, 76. Hence, despite Mother's initial progress in confronting her parenting problems, domestic violence, and anger management, Ms. Hall testified that Mother failed to satisfy these three remaining objectives by the time the caseworker left the case in September of 2021. *Id*. at 17-18.

Regarding Mother's mental health treatment, Ms. Hall testified that Mother had engaged in therapy at Esperanza Community Council "prior to 2018, and [M]other was supposed to reengage with her therapist on a consistent basis." *Id*. at 77. Ms. Hall testified she did not know whether Mother attended mental health therapy at all during I.C.-A.'s and Y.E.C.-A.'s dependencies because Mother did not sign the required releases for the CUA "to obtain all needed information" about her mental health. *Id*. at 18, 77-78,

- 14 -

89-90. In August of 2021, Ms. Hall learned that Mother was admitted to the hospital for her mental health. *Id*. at 21-22. However, Ms. Hall testified that Mother again failed to provide any documentation regarding the hospitalization. *Id*. at 22.

On cross-examination by DHS, Mother confirmed that she is diagnosed with depression, and stated, "I don't sleep at night." *Id*. at 156. Mother testified that she was attending mental health treatment once per week. *Id*. at 147. However, she could neither document her progress, name the mental health facility, nor identify her provider. *Id*. Indeed, during the three years that I.C.-A. and Y.E.C.-A. have been involved in the dependency proceedings, Mother has not provided the CUA with any documentation concerning her mental health status and treatment. As such, the testimonial evidence demonstrates that Mother has failed to satisfy her mental health objective.

With respect to supervised visitation, Ms. Hall testified that Mother did not consistently participate. *Id*. at 76. Our review of the certified record reveals that Mother was transient during some of the underlying matter. *Id*. at 21. On inquiry by the trial court, Ms. Hall acknowledged that there was an unspecified period when Mother was living with her paramour, an over-the-road trucker, in his truck. *Id*. at 87. Ms. Hall estimated that Mother missed approximately three months of supervised visitation with I.C.-A. and Y.E.C.-A. In 2021, prior to her leaving the case. *Id*. Ms. Coles, the CUA caseworker who began supervising visitation in May of 2021, testified that Mother's visits

were stopped in June 2021, due to her missing four consecutive appointments.[8]  *Id*. at 95-96, 120-121.  Finally, Ms. Hall testified that Mother did not attend court hearings, her remaining objective.  *Id*. at 18.  Ms. Hall testified that I.C.-A. and Y.E.C.-A. could not be reunified with Mother at the time of the termination hearing because of her "inability to be consistent with the children, to be consistent with the [CUA], and to be consistent with all court ordered programs. . . ."  *Id*. at 32.

As highlighted by the foregoing evidence, the certified record belies Mother's assertion that she completed a substantial amount of her permanency objectives.  With respect to Mother's claim that she had "moved in with her sister and started to more regularly attend mental health" and had "resumed visits," it was within the trial court's discretion to reject it as "untimely or disingenuous."  Mother's brief at 12; *In re S.C.*, *supra* at 1105.

Moreover, the evidence demonstrates that Mother's repeated and continued incapacity due to her mental health has caused these children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being.  At the outset of these dependency proceedings, Dr. Reinhold found that Mother lacked insight into what is required to ensure the children's safety or be reunited with them.  Psychological Evaluation,

---

[8]  Khalif Rhodan, Ms. Hall's successor, reinitiated Mother's supervised visitation, which was to commence on the day of the evidentiary hearing. N.T., 12/7/21, at 95.

- 16 -

9/25/18, at 14. Similarly, Dr. Duggal opined that Mother did "not present with the capacity to provide safety, permanency, and well-being" to O.C.-A., I.C.-A., and Y.E.C.-A. Parenting Capacity Evaluation, 10/11/19, at 16. Mother has not presented any evidence to contest those findings. To the contrary, the record demonstrates that Mother's mental illness still renders her incapable of providing for the children's needs and Mother cannot or will not remedy that incapacity. As such, the trial court did not abuse its discretion in terminating Mother's parental rights pursuant to § 2511(a)(2).

In her second issue, Mother baldly asserts that DHS also did not satisfy its burden of proof pursuant to § 2511(b) because a bond existed between her and I.C.-A. and Y.E.C.-A, and they would be harmed if the bond was severed.[9] Mother's brief at 13. Unfortunately for Mother, the certified record does not support this contention.

We review the needs-and-welfare analysis to determine whether the trial court gave "primary consideration to the developmental, physical and emotional needs and welfare of" I.C.-A. and Y.E.C.-A. in terminating Mother's parental rights. 23 Pa.C.S. § 2511(b). In making this determination, the trial court was required to "discern the nature and status of the parent-child bond,

---

[9] Mother's counsel erroneously sets forth facts that are not applicable in this appeal, referring to two children and a CUA caseworker who are neither the children nor the DHS witness involved in this case. *See* Mother's brief at 14.

with utmost attention to the effect on the child of permanently severing that bond." **In re C.M.S.**, *supra* at 1287.

Our Supreme Court has explained, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **In re T.S.M.**, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The **T.S.M.** Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

As set forth above, Mother was not consistent with supervised visitation throughout the history of this case. There is no testimonial evidence that a parent-child bond existed between Mother and I.C.-A., then seven years old, and Y.E.C.-A., then three years old. Ms. Coles testified that she supervised three visits prior to June 1, 2021. N.T., 12/7/21, at 122. Although I.C.-A. and Y.E.C.-A. were happy to see Mother during those visits, they did not have trouble separating from her when the visits ended. *Id*. at 122-123. By the time of the evidentiary hearing, I.C.-A. and Y.E.C.-A. had not participated in a supervised visit with Mother in approximately seven months. In the meantime, their essential needs were being met by their respective foster mothers, E.B. and K.G.

Ms. Hall visited I.C.-A. in E.B.'s home monthly throughout her time on this case. She testified that I.C.-A. "has definitely opened up more. He's exploring more, but he's very quiet. He enjoys [E.B.]'s help and her assistance. He has no issues in the home." *Id*. at 34. Ms. Hall testified that I.C.-A. looks to E.B. to provide his daily needs. *Id*. at 35.

E.B. testified regarding I.C.-A.'s educational delays, her persistence in having him tested for I.E.P.'s, and her assistance with his schoolwork. *Id*. at 106-107, 118-119. With respect to I.C.-A. and his older brother, O.C.-A., she explained:

> [S]eeing how they've been with me over a year, it's [sic] taken that long for them to comprehend three letter words. And, in [I.C.-A.'s] case, because he also has memory loss from his condition — so, he does not retain information the same way another kid would.[10]
>
> So, it's a lot of reintroducing the same work over and over for him. But he is able to grasp some understanding and meaning of words.
>
>     . . . .
>
> So, along with the ADHD — attention deficit disorder that they both have, you have to give them the information in a way where they retain it.

*Id*. at 118-119. E.B. also noted that I.C.-A. grades are improving. *Id*. at 108. Likewise, he continues to participate in therapy, which commenced before he began living with her, for behavioral issues and trauma. *Id*. at 106.

---

[10] E.B. did not specify the condition that caused I.C.-A's memory loss.

In addition, E.B. testified regarding I.C.-A.'s cardiac problem and his recent appointment at St. Christopher's Hospital, where he had an echocardiogram. *Id*. at 109. She explained that I.C.-A. had surgery on his heart before she met him, but recent testing showed that I.C.-A.'s "chamber to his left side was supposed to be totally closed off, and only the right side of his heart is supposed to be functioning, but they found that it's leaking over." *Id*. E.B. testified that the cardiologist directed that I.C.-A. digest one baby aspirin daily, and that his cardiac problem be monitored. *Id*.

With respect to the youngest child, Y.E.C.-A., he has resided with his foster mother, K.G., since his discharge from the hospital after birth. Ms. Hall testified that she regularly visited Y.E.C.-A.'s foster home as well, and she found, "He's very attached to [K.G.]." *Id*. at 36.

K.G. testified that Y.E.C.-A. began residing with her in September of 2018. *Id*. at 137. She desires to adopt him. *Id*. at 140. K.G. testified that Y.E.C.-A. "has a speech delay" for which he receives therapy. *Id*. at 137, 139.

As both children continue to thrive in their respective pre-adoptive foster homes, the certified record supports the trial court's finding that the termination of Mother's parental rights will serve the developmental, emotional, and physical needs and welfare of I.C.-A. and Y.E.C.-A. That is a key component of the § 2511(b) analysis. *See In re A.S.*, *supra* at 483 ("[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such

as the love, comfort, security, and stability the child might have with the foster parent."). Accordingly, we discern no abuse of discretion by the court in terminating Mother's parental rights pursuant to § 2511(b).

In her third and final issue, Mother asserts that DHS also failed to satisfy its burden of proof in changing the permanency goals of I.C.-A. and Y.E.C.-A. to adoption because she substantially completed her court-ordered objectives. Mother's brief at 15-16. Again, Mother's claims fail.

We review decisions changing a placement goal for an abuse of discretion. *In re R.J.T.,* 9 A.3d 1179, 1190 (Pa. 2010). When considering a petition for a goal change for a dependent child, the trial court must determine the matters set forth at 42 Pa.C.S. § 6351(f) of the Juvenile Act. *In re S.B.*, 943 A.2d 973, 978 (Pa.Super. 2008). In making these determinations, the best interests of the child, and not the interests of the parent, must guide the trial court. *In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011).

For all of the foregoing reasons discussed in affirming the decrees terminating Mother's parental rights, we conclude that competent evidence in the certified record supports the orders changing I.C.-A.'s and Y.E.C.-A.'s permanency goals to adoption. In sum, Mother's mental illness renders her incapable of providing for the special needs of I.C.-A. and Y.E.C.-A. Further, for more than three years, Mother has not been a consistent presence in their lives. I.C.-A.'s and Y.E.C.-A.'s needs are being met by their respective foster

mothers, in whose homes they remain safe, stable, and secure.  Accordingly, we discern no abuse of discretion.

Decrees affirmed.  Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/9/2022